Joseph Maus *v.* John Hummel, George Meixel, and Others.

1. The lien of a debt upon a decedent's land was extended to twelve years from his death by bringing suit within the first seven years after that event, under the act of 1797; but if the land was not brought into execution within, it would vest in the heir absolutely at the expiration of, the twelve years.

2. And a purchaser of it at sheriff's sale, after the expiration of the twelve years, upon a proceeding begun within the first seven, would acquire no title.

Error to the Common Pleas of Union.

*July* 11. This was an action of ejectment, in which Joseph Maus was plaintiff, and John Hummell and others were defendants. The plaintiff's title originated thus :—

The land in controversy belonged to one Jeremiah Jackson, who would seem to have died some time before 29th January, 1801, on which day letters of administration on his estate were granted to W. P. Brady and others. To April Term, 1802, an amicable action was entered between one Long as plaintiff, and these administrators as defendants. On 29th November, 1802, administration *de bonis non* was granted on Jackson's estate to William and Lydia North; and afterwards, 9th February, 1804, to Henry Vanderslice. This last administrator, on 15th August, 1810, being substituted as defendant in the amicable action, confessed judgment therein, stipulating that he was not to be personally liable on any account.

On this judgment a *fi. fa.* 82, August Term, 1810, was issued and levied on other land, the estate of Jackson, which was sold on *ven. ex.* 15, November Term following. The proceeds of this sale not paying off the judgment a *fi. fa.* 44, November Term, 1813, was issued and levied on the land in controversy, which was sold upon *al. ven. ex.* 36, April Term, 1814, to Charles Maus and Abraham Keihl for $10, on 29th April. These purchasers received the sheriff's deed, and Joseph Maus became on 25th August, 1842, the owner, by purchase at sheriff's sale of Charles Maus's interest in the land. The plaintiff gave evidence tending to show possession of the land by Charles Maus, from 1815 to 1828.

The defendants showed that this land was sold for a direct tax, that the vendee of the collector took possession in 1828, and that he, as then claiming under his title, had held it ever since.

Among the points presented to the court below (WILSON, President), and the answers thereto, were the following :—

2d point. "That although Joseph Long was bound to bring his action within seven years after the death of Jackson, he was not bound to prosecute it to judgment within that time ; and a judgment recovered after that period, with due diligence, would have continued the lien for a further period of five years, from the date of such judgment."

Answer : " To continue his lien for seven years he was not bound to prosecute his action within that period, and a judgment recovered after that period, after prosecuting his action so commenced, with due diligence, would continue the lien for another period of five years."

3d point. " That if Joseph Long would have commenced no suit at all the lien would have continued seven years, and if suit had been brought immediately before the expiration of the seven years, the lien would have continued till five years after judgment.",

Answer : " If Joseph Long had not commenced his suit, the lien would have continued seven years. But we do not say that if suit had been brought immediately before the expiration of the seven years, the lien would have continued five years after he obtained his judgment. It would, to continue it five years after judgment, require that Long should duly prosecute his suit. If he could not, after he brought his suit at that late period within the seven years, obtain an earlier judgment by using the ordinary means afforded him by the law, it would then continue his lien of debt for five years from the date of his judgment, but not without using such ordinary means to procure his judgment."

4th point. " That a want of due diligence in Joseph Long, in the prosecution of his suit, for the recovery of his debt, is not to be presumed without some circumstances shown upon which to predicate such a presumption."

Answer : " We do not say that in a case circumstanced as this one is, that want of due diligence is presented as a matter of presumption. The law requires a party, to continue his lien, that his action be duly prosecuted, and the plaintiff must show by facts and circumstances that he was prevented from duly prosecuting his action, in order to continue his lien. As applicable to this suit, we refuse to answer as requested."

5th point. " That the institutor of the suit, within a year or two after the death of Jackson, did not compel him to use any dili-

U

gence in prosecuting it to judgment until after the expiration of the seven years."

Answer : " We do not answer as requested.   The law says the action to secure the lien must be commenced within seven years, and duly prosecuted; and having brought his action within a year or two after the death of the decedent, the law does not mean that the due prosecution shall commence after the seven years."

The verdict was for the defendants; and the answer of the court to these points, and the charge that " the sale by the sheriff of Northumberland county to C. Maus and Keihl, under whom the plaintiff claims, confers no title," were assigned for error here.

*Slenker*, for the plaintiff in error.—The debt of Long had not lost its lien: Trevor *v.* Ellenberger, 2 Pa. R. 94; Duncan *v.* Clark, 7 W. 225; Penn *v.* Hamilton, 2 Ib. 58; Fetterman *v.* Murphy, 4 Ib. 429; Steel *v.* Henry, 9 Ib. 523; Payne *v.* Craft, 7 W. & S. 464.   Act of 1798, limiting the lien of judgments; Young *v.* Barrow, 2 Binn. 218; Lewis v. Smith, 2 S. & R. 162; Pennock *v.* Hart, 8 S. & R. 878.

*Miller* and *Linn*, contrà.

The opinion of this court was delivered by

COULTER, J.—In Penn *v.* Hamilton, which followed Kerper *v.* Hock, and affirmed the doctrine therein contained, it was distinctly ruled, that the debts of a deceased person remained a lien on the real estate for seven years, and no longer ; unless a suit was brought within the seven years and duly prosecuted, in which event the lien was continued five years longer.   The construction given to the words " duly prosecuted," is, that no matter at what time within the seven years the suit was brought, it continued the lien for five years after the termination of the seven, although judgment was not obtained within the seven.   The lien, therefore, of the debt in this case extended twelve years from the time of Jackson's death, and no longer ; and, the land in dispute not having been brought into execution within that period, was beyond its power, and the estate had vested in the heir absolutely at the expiration of the twelve years.   The decedent died before the 29th January, 1801, because letters of administration were then granted on his estate.   To April Term, 1802, an amicable action was entered between Abraham Long, plaintiff, and Jackson's administrator, which was permitted to slumber on the record until August 15th, 1810, when the administrator *de bonis non*, appointed in 1804, confessed judgment for 51*l.* 15*s.* 2*d.*   To August Term,

1810, a *fi. fa.* issued, which was levied on other land, which was subsequently sold.  To November Term, 1813, a *fi. fa.* issued for the residue, on which the tract of land in dispute was levied upon and sold on *ven. ex.* to April Term, 1814, and bought by those who now claim, or their representatives, for $10.  At the time of the levy, twelve years and more had expired from the death of decedent. But it is contended by plaintiff in error, that the lien of the debt was prolonged, by issuing execution on the judgment, to an indefinite period, and that, as lands are assets for the payment of debts, the judgment, after the seven years, was a personal charge against the administrator, on which an execution might issue at any time, and the lands be sold, whilst in the hands of the heirs, as chattels. In this aspect of the case, the famous decision of Fetterman *v.* Murphy is cited.  But the supplemental, or rather explanatory opinion of the Chief Justice, delivered after Judge Huston had expressed the opinion of the court, takes away from the plaintiff in this case all support from that prop.  Fearing that the opinion of Judge Huston might misguide the profession, the Chief Justice declares that the court had not the slightest intention to weaken or impair the doctrine of Penn *v.* Hamilton, and Kerper *v.* Hock, but, on the contrary, re-affirms them.  Those and the kindred cases in our books establish, that, at the end of twelve years from the death of a decedent, land not converted, or perhaps not in actual process of sale on *ven. ex.*, becomes the property of the heir, liable to his debts, and subject to his dominion.  He is compelled to endure a long and wearisome expectancy, whilst the creditor slumbers over his claim.  The intent of the legislature is not to be doubted. They designed to produce the settlement of estates in a reasonable period—to establish repose and certainty in titles, and free estates from dormant, slumbering, and secret liens.  They intended to benefit the heir or devisee, in so far, at least, as society would be benefited by making estates free for transmission, and liable for the debts of the living, who, for the third of a generation, were the apparent owners.  As society advances, rules are established and obtain which have regard to all classes, doing justice to each in their respective spheres.

In this state it is true that lands are chattels for payment of debts of deceased persons, and it was a wise and just policy which established the rule.  But the same law which made them so, prescribed the manner and time in which they should be sold for that purpose. They never were subjected by any statutory enactment to the same manner of sale, the same mode of levy, or the same manu-

caption as mere personal chattels. Such a thing could not have been done; it would have produced confusion, and would have marred and overturned, and obstructed the regular system for the transmission and change of title to real estate, for the payment of debts or otherwise, which was devised, and from time to time has been perfected in Pennsylvania.

We never adopted the writ of *elegit* or the *statute merchant*, and lands of decedents were not subject to execution for the payment of debts by the common-law process, which has hardly a gleam of affinity to the statutory process.

The whole remedial procedure is the creation of our own statutes; the mode of taking lands in execution is prescribed, and is never in any case authorized, by statute at least, when the lien does not exist. The levy, condemnation, or extension, the mode of sale, are all provided for, and so are the means by which the purchaser shall obtain possession. The whole is part of a great system *respecting* real estate, and its transmission from hand to hand, by voluntary sale, by compulsory sale for the payment of debts, and by descent or devise.

The features of that system look to the repose and certainty of titles, the quieting and preventing disputes, and the limitation of litigation to a period which does not encroach too much upon the short life of man. Our act of Assembly of 21st March, 1806, provides, that when a remedy is provided or a duty enjoined, or anything prescribed to be done by act of Assembly, the directions of said act shall be strictly pursued, &c. We are therefore bound to give full effect to the provisions of the statute, giving a remedy to the creditor out of the real estate; but we are also bound to give effect in their full scope to the directions of the statute, for the purpose of making titles secure, and for the purpose of protecting the heir. We cannot resort to the doctrines of the common law, which respect the sale of mere chattels, and by a forced analogy subvert the plain words of the statutory remedy.

The effect of this analogy, as attempted by the counsel of the plaintiff in error, would protract the lien of debts upon decedents' estates indefinitely, stop the improvement of estates, and harass the heir with tantalizing hopes and fears, all to indulge the caprice, obstinacy, or negligence of a creditor, who has been allowed by the benevolence of the law twelve long years to consider over his claim, and hold the heir in mercy. Life is too short, and the law too just, to protract his power longer. In that lapse of time, oral and written testimony may perish and be lost, and the heir may be rendered

unable to prove the payment, where a debt has been actually satisfied.

It has been fully settled by this court, that duly prosecuting the suit, when suit has been brought within the seven years, only extended the lien of the debt to twelve years; and that obtaining judgment against administrators created no lien distinct from that of the lien of the debt. That lien being gone in this case, before the levy and before the sale, no title was conferred upon those who purchased. They stand just as naked and alone as if they had never bought.

It was suggested, that there was no proof that Jackson left heirs, and that therefore there was no outstanding title. But if he did not, his estate would escheat, for want of heirs, to the Commonwealth, and would not vest in Maus. But his heirs were not parties; we cannot exscind them in this proceeding, living or dead; nor can we presume that Jackson was like Melchisedek. But as we are of opinion that Maus purchased no title, that rules the whole case.

Judgment affirmed.

BELL, J., dissented, on the ground that, as the title under which the defendants claimed was derived neither from an heir, encumbrancer, or purchaser for value, the act of 1797 did not apply.